**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ZEPHYRINUS EGBUONU** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **2:07-CV-685-ID** |
| **KILBY CORRECTIONAL** | ) |
| **FACILITY, ET AL.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## SPECIAL REPORT

COME NOW the Defendants, Howard Williams, Kenneth Cash, Bobby Barrett, Leon Varner, Michael Warren, W.G. Rowell, and Terrance McDonnell, by and through undersigned counsel, and in accordance with this Honorable Court's September 20, 2007, and October 29, 2007, (Doc. 31) Orders, offer the following written report.

## PARTIES

1.  The Plaintiff, Zephyrinus Egbuonu, is a former inmate of the Alabama Prison System and is currently an immigration civil detainee at the Federal Detention Center in Oakdale, Louisiana.

2.  Defendant Howard Williams is a Steward I for the Alabama Department of Corrections and is assigned to Kilby Correctional Facility.

3.  Defendant Kenneth Cash is a Correctional Lieutenant for the Alabama Department of Corrections and is assigned to Kilby Correctional Facility.

4.  Defendant Bobby Barrett is a Correctional Warden II for the Alabama Department of Corrections and is currently assigned to Staton Correctional Facility.

5. Defendant Leon Varner is a Steward II for the Alabama Department of Corrections and is assigned to Kilby Correctional Facility.

6. Defendant Michael Warren is a Steward III for the Alabama Department of Corrections and is assigned to Kilby Correctional Facility.

7. Defendant W.G. Rowell is a Warden II for the Alabama Department of Corrections and is assigned to Kilby Correctional Facility.

8. Defendant Terrance McDonnell is currently a Associate Commissioner for the Alabama Department of Corrections.

## EXHIBITS

EXHIBIT 1 – Affidavit of Howard Williams

EXHIBIT 2 – Affidavit of Kenneth Cash

EXHIBIT 3 – Affidavit of Bobby Barrett with attachment

EXHIBIT 4 – Affidavit of Leon Varner

EXHIBIT 5 – Affidavit of Michael Warren

EXHIBIT 6 – Affidavit of W.G. Rowell with attachment

Affidavit of Terrance McDonnell (to be submitted separately)

## PLAINTIFF'S CLAIMS

Plaintiff claims that the conditions of his work assignment in the kitchen at Kilby Correctional Facility were unsafe, exposed him to injury, and that the Defendants failed to provide him with adequate safety equipment for him to perform his duties without being injured. Plaintiff alleges a series of "injuries" that occurred to him while in the performance of his duties and that the alleged failure of the Defendants to remedy the situation he complained of rises to a violation of his Eighth Amendment rights under the

United States Constitution. Plaintiff further contends that he was called a "knucklehead" and that this somehow amounts to an actionable tort for defamation under federal and state law.   The Plaintiff demands $100 for every hour he worked in the kitchen, $1,200,000.00 in compensatory damages, $500,000.00 in "consequential" damages, $800,000.00 in "cosmetic" damages, $500,000.00 in "discretionary" damages, an unspecified amount in "non-pecuniary" damages, $500,000 in punitive damages against the remaining Defendants and an award of attorney's fees.

## DEFENDANTS' RESPONSE

1.      The Defendants deny that they violated the Plaintiff's constitutional rights.

2.      The Defendants deny each and every material allegation not specifically admitted herein and demand strict proof thereof.

3.      The Plaintiff has failed to state a claim upon which relief may be granted.

4.      The Plaintiff assumed the risk of injury.

5.      The Plaintiff's own negligence caused and/or contributed to his alleged injuries and he is therefore barred from recovery.

6.      The Defendants are immune from suit under the Eleventh Amendment to the United States Constitution.

7.      The Defendants are immune from suit due to qualified immunity.

## STATEMENT OF FACTS

Defendant Warren is responsible for the administrative operation of the kitchen at Kilby Correctional Facility. Exhibits 5, 6.  He trains all of the kitchen stewards in the operation of the kitchen and kitchen sanitation.  Exhibit 5.  Defendant Warren is certified by the State of Alabama Health Department to conduct this training. Exhibit 5.  He

assigns inmates to specific job duties within the kitchen, instructs and trains them in the assigned responsibilities, and insures that all public health requirements are met in the preparation of the prison's food. Exhibit 5. Defendants Warren and Williams constantly make sure that the kitchen is a safe work environment. Exhibits 1, 5. Defendant Warren inspects the kitchen on an hourly basis for maintenance problems and immediately requests assistance from the Kilby Maintenance Division to make any necessary repairs. Exhibit 5. The kitchen is a safe work environment. Exhibits 3, 5.

Plaintiff was assigned by the Institutional Job Board in October of 2005 to work in the Kilby Food Services Division. After being assigned to the 2nd shift as a line server in the kitchen by Chief Steward Michael Warren, Plaintiff immediately began asking for a job assignment change. Exhibits 4, 5. Plaintiff's complaints centered on his allegation that being on 2nd shift denied him access to the law library. Exhibits 1, 5. Chief Steward Warren approved Plaintiff's request and reassigned him to 1st shift. Exhibit 1, 4, 5.

Upon starting work on the 1st shift, Defendant Warren assigned Plaintiff the duties of pots and pans dish washer as that was the only vacant slot on the 1st shift. Exhibit 5. Plaintiff was required to wash the pots and pans used in cooking the prison food in accordance with the Alabama Health Department Standards. Exhibit 5. According to these standards, wash water must be 120 degrees, rinse water must be 140 degrees, and sanitizing water must be 170 degrees. Exhibits 1, 5. In accordance with these requirements, elbow length neoprene gloves that are heat resistant are provided to the inmates assigned to this task. Exhibits 1, 5. The gloves are available in the pots and pans area and the inmates are instructed to wear them while performing this job. Exhibits 1, 5. Four to five pairs of these gloves are ordered at a time and a pair has an average useful

life of one year.  Exhibit 5.  Each shift uses the gloves until they are in need of replacing. Exhibit 5.

Inmates are given specific instructions on the proper amount of detergent to use. Exhibit 1.  The label to the detergent states that it is formulated to be especially mild and gentle to hands, but capable of doing a thorough cleaning.  Exhibit 1.

On May 2, 2006, then Deputy Warden Bobby Barrett, who is now Warden at the Staton Correctional Facility, received a request slip from Plaintiff requesting gloves to protect his hands.  Exhibit 3.  Warden Barrett spoke to Plaintiff personally and referred him back to his supervisor.  Exhibit 3.  Plaintiff stated that he understood.  Exhibit 3. Warden Barrett also recalls Plaintiff as constant complainer primarily concerning working in the kitchen.  Exhibit 3.  Part of Warden Barrett's job duties at the time was Captain over the job placements.  Exhibit 3.  Warden Barrett saw no indication that Plaintiff needed to be moved. Exhibit 3.

Plaintiff complained to Defendants Warren and Williams several times about the kitchen's detergent alleging that it was "wearing his fingers off" and Plaintiff expressed concerns for his safety.  Exhibits 1, 5.  Defendant Warren took Plaintiff to the pots and pans area and asked him why he was not wearing the safety gloves that were lying in a red milk crate sitting next to the pot sink, and asked if Plaintiff knew how much soap and bleach that he was supposed to use.  Exhibit 5.  Plaintiff did not respond.  Exhibit 5. Defendant Warren instructed Plaintiff again on the proper use of gloves and the appropriate amount of cleaners to use.  Exhibits 1, 5, 6.  Plaintiff continually and intentionally failed to utilize the protective gloves provided for him and added 50% more chemicals to the water than needed.  Exhibits 5, 6.  When Defendant Warren asked him

why he was doing this intentionally, Plaintiff responded, "Because I do not want to be in the kitchen." Exhibits 5, 6.

Every time an inmate makes a complaint known regarding his health, injuries, or problems in the kitchen, the Stewards are instructed to contact the Shift Commander's Office for permission to send the inmate to the health care unit, or allow the inmate to sign up for sick call to receive medical care. Exhibits 1, 5. It is the inmate's responsibility to report to the health care unit for treatment. Exhibits 1, 5. It is not the responsibility of the Stewards to escort them to the health care unit. Exhibits 1, 5. If the health care unit provides the inmate with a "stop up/pink slip" for a certain number of days to be absent from work, or otherwise restricts his duties, the kitchen honors that request until the inmate is released from the restrictions. Exhibits 1, 5. Plaintiff never presented a pink slip of any kind to Defendant Warren or the other Stewards. Exhibits 1, 5.

Plaintiff complained to Defendant Williams once about a cut on his hand or finger and Defendant Williams instructed him to report to the medical unit. Exhibit 1. Plaintiff did not return with any stop up or pink slip, so Defendant Williams gave him a pair of latex gloves to keep the cut area dry when he was not washing pots and pans. Exhibit 1.

All inmates are required to wear state brogans which Plaintiff refers to in his complaint as a "safety shoe", or they may wear their personal leather or vinyl tennis shoes at their discretion to prevent hot water from splashing or spilling on their feet. Exhibits 1, 5. State brogans are issued by the Laundry Manager, Tommy Dawson. Exhibits 1, 5. Once these brogans become worn out, the inmate shows Mr. Dawson the worn out shoes and they are replaced. Exhibit 1. There are also several pairs of 12 inch

heat resistant boots available to the inmates for added safety and that were available to Plaintiff at all times. Exhibit 5.

While Plaintiff continued to make complaints about problems with his hands from chemicals, hot water and cuts, he also continually refused to wear the safety gear that was provided to him. Exhibit 5. Additionally, Plaintiff refused to report to the health care unit for medical treatment concerning any complaints. Exhibit 5. There are no medical records or body charts of any of the complaints Plaintiff was making except for one body chart where Plaintiff complained that hot water in a mop bucket had leaked out onto Plaintiff's foot and into his shoe. Exhibits 5, 6. The only injury noted was a small red area near the small toe. Exhibit 5. This is apparently the injury Plaintiff is referring to in paragraphs 56-59 of his complaint. The Defendants are unaware of any injury on 6-6-06 to another inmate as alleged. Exhibit 1.

Defendant Varner does not recall any conversations with Plaintiff regarding the contents of the dish washing detergent as he was not Plaintiff's immediate supervisor. Exhibit 4.

Defendant Varner trains all inmates on 2nd shift in the proper sanitation and safety procedures in washing the pots and pans to include temperatures of the water, gloves available to be used in the washing area, amounts of detergent to be used and the appropriate way to use the soaps and cleaners. Exhibit 4.

At no time did Defendant Varner tell Plaintiff that the kitchen did not have funds to provide inmates with safety gear. Exhibit 4. Kilby Correctional Facility does not provide individual inmates a personal pair of gloves, but rather the gloves provided in the area are used by all inmates assigned to the kitchen. Exhibit 4. At no time did Defendant

Varner advise Plaintiff to complain to the Warden.  Exhibit 4.  At no time has Defendant Varner failed to provide proper safety and operating instructions to inmates assigned to kitchen duties on his shift.  Exhibit 4.

Inmates that are newly assigned to the kitchen are paired with an experienced inmate until the new inmate is fully trained.  At no time are inmates exposed to unsafe occupational areas or chemicals.  Exhibits 4, 5.

Defendant Williams did call Plaintiff a "knucklehead".  Defendant Warren did counsel Defendant Williams regarding calling Plaintiff a "knucklehead".  Exhibit 5. Defendant Williams called Plaintiff this when he saw Plaintiff climbing and attempting to plug a ceiling fan in that was experiencing mechanical problems.  Exhibits 1, 5. Defendant Williams used the term only to mean that Plaintiff should have known better than to climb up and plug in a ceiling fan without first checking with his office to see what the problem was and due to Defendant Williams concern that Plaintiff could have fallen and gotten hurt.  Exhibits 1, 5.  The Kilby Maintenance Division is responsible for all repairs in the kitchen.  Exhibits 1, 5.

Lieutenant Cash is the 3rd Shift Commander and is constantly called to the kitchen to help the Stewards with problem inmates.  Exhibit 2. He does not recall being called to assist with a problem with Plaintiff, and states that if he were it would have been something very minor.  Exhibit 3.  He does not remember calling any inmate a "knucklehead".  Exhibit 3.  He never threatened or coerced Plaintiff in any way.  Exhibit 3.  None of the Defendants have violated Plaintiff's constitutional rights in any way. Exhibits 1, 2, 3, 4, 5, 6.

## ARGUMENT

A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan,* 511 U.S. 825 (1994). Under this standard, to survive summary judgment, the plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation. *See LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir.1993). Mere negligence on the part of prison officials resulting in injury to an inmate under their care is distinguishable from deliberate indifference and cannot support a constitutional claim under § 1983. *Daniels v. Williams,* 474 U.S. 327, 333 (1986); *Davidson v. Cannon,* 474 U.S. 344 (1986). To amount to a violation of the Constitution, the officials' actions must be deliberate or reckless in the criminal sense. *Whitley v. Albers,* 475 U.S. 312, 321 (1986).

In establishing liability pursuant to § 1983, a prisoner cannot rely on theories of vicarious liability or respondeat superior. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115-16 (11th Cir. 2005). Section 1983 requires proof of an affirmative causal link between the official's acts or omissions and the alleged constitutional deprivation. *See Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir. 1986). The causal connection may be proven by showing the official (1) was personally involved in the acts or omissions which resulted in the constitutional deprivation; (2) established a policy or custom that resulted in the constitutional deprivation; or (3) breached a duty imposed by state or local law. *Id.*

"[D]eliberate indifference is a stringent standard of fault, requiring proof that [the] actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs v. Brown,*

117 S.Ct. 1382, 1391 (1997). *See also Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Plaintiff has failed to meet his burden of establishing that the Defendants were deliberately indifferent. The evidence of this case shows that Plaintiff deliberately tried to create a situation that would remove him from kitchen duties, and that none of his "complaints" were significant enough for him to seek medical treatment.

Further, "[t]he State of Alabama, its agencies, and its officials acting in their official capacities are not considered 'persons' for purposes of an action for damages under 42 U.S.C. § 1983." *State Dep't of Pub. Safety v. Sexton,* 748 So.2d 200 (Ala. Civ. App. 1998) (citing *Hafer v. Melo,* 502 U.S. 21 (1991)). Inasmuch as Plaintiff has sued the Defendants in their official capacities, he is barred from any monetary claims.

The Eighth Amendment "does not authorize judicial reconsideration of every governmental action affecting the interests or well-being of a prisoner." *Calhoun v. Thomas*, --- F.Supp.2d ----, 2005 WL 646803 (M.D. Ala. 2005); *Miller v. King,* 384 F.3d 1248, 1260 (11th Cir.2004) (internal quotations omitted) (quoting *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)). Prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Farrow v. West,* 320 F.3d 1235 (11th Cir.2003). To demonstrate an Eighth Amendment violation with respect to conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Miller,* 384 F.3d at 1261. Under the objective inquiry, he must prove that he was denied the "minimal civilized measure of life's necessities." *Id.* (quoting *Chandler v. Crosby,* 379 F.3d 1278, 1289-90 (11th Cir.2004)). The condition challenged condition must be "extreme" and must pose "an unreasonable risk of serious damage to his future health." *Chandler,* 379 F.3d at 1289-90. Under

the subjective component, the prisoner must prove that the prison official acted with "deliberate indifference" in disregarding that risk. *Farmer v. Brennen*, 511 U.S. 825, 837 (1994. Plaintiff in this case can satisfy neither the objective inquiry nor the subjective inquiry.

In *Farmer v. Brennen*, 511 U.S. 825 (1994), the Supreme Court summarized the two-part test that must be applied in determining if a prison official violated the Eighth Amendment:  (1) The alleged deprivation must be objectively, sufficiently serious.  This requires a showing that the official's action or omission resulted in the denial of "'the minimal civilized measure of life's necessities.'"  *Id*. at 834 (citations omitted); and (2) the prison official must have a "sufficiently culpable state of mind," which translates to "deliberate indifference" in cases challenging conditions of confinement.  *Id*. at 834 (citations omitted).

The subjective component of the test requires the Court to determine if the official acted with a "sufficiently culpable state of mind."  *Hudson v. McMillan*, 503 U.S. 1, 8 (1992).   In cases challenging prison conditions, the requisite state of mind is deliberate indifference to an inmate's heath or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   *Farmer* provides the following explicit definition of deliberate indifference:

> A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

*Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994), quoted in *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999).    The standard for a claim of deliberate indifference is: "(1)

subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F. 3d 1248, 1255 (11th Cir. 1999).

The Plaintiff alleges that the kitchen was unsafe and that he was not provided sufficient training and safety gear.  Plaintiff has failed to present evidence to support his claims, and the evidence submitted herewith by the Defendants shows that his allegations are without merit and that the Defendants are entitled to a summary judgment in their favor.

The evidence presented by Defendants shows that they did not act with deliberate indifference. The Defendants have shown they did not know of and disregard an excessive risk of harm to the Plaintiff's health or safety, but that any risk at all to Plaintiff was brought on by his own desire to shirk his assigned responsibilities.  Therefore, they are entitled to a summary judgment in their favor.

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."   The Amendment therefore not only bars suits against a state by citizens of another state, but also bars suits against a state by that state's own citizenry. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94 S. Ct. 1347, 1355 (1974) and *Hans v. Louisiana*, 134 U.S. 1, 13-15, 10 S. Ct. 504, 33 L.Ed. 842 (1890).  The Eleventh Amendment also prohibits suit against state officials and employees where the state is the real, substantial party in interest. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-02, 104 S. Ct. 900, 908-09, 79 L.Ed.2d 67 (1984).  "For example, if a lawsuit seeks to order the state officer to pay funds directly from the state treasury for the wrongful acts of the state, then the state is the real party in interest and the Eleventh Amendment bars the suit." *Summit Medical Associates, P.C. v. Pryor*,

180 F.3d 1326, 1336 (11th Cir. 1999). This suit is in reality a suit against the State; thus, the defendants should be dismissed based on immunity.

In addition, these Defendants are protected by qualified immunity. As stated by the Eleventh Circuit, "[q]ualified immunity protects government officials from civil trials and liability when their conduct in performing discretionary functions 'violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Blankenship*, 163 F.3d 1284, 1288 (11th Cir. 1998) (quoting *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)). *Wilson, supra* (holding that the marshal, wardens, and corrections officer were protected by qualified immunity); *see also Pinkney v. Davis*, 952 F. Supp. 1561 (M.D. Ala. 1997) (holding that wardens, deputy warden, and other prison officials were entitled to qualified immunity). The Eleventh Circuit has held that "[p]rison officials have 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Wilson*, 163 F.3d at 1295, *quoting Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878 (1979). None of these Defendants have violated Plaintiff's clearly established rights; thus, they are entitled to qualified immunity.

The allegations made by Plaintiff in the case at bar simply do not rise to the level required by law to maintain an action. There is nothing outside of Plaintiff's bare allegations to suggest that the Defendants were *both* aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, or that they drew that inference. To the contrary, the only evidence indicates that Plaintiff was failing to use safety measures in an attempt to get out of work. Plaintiff simply cannot meet his burden for bringing this type of action.

With regard to Plaintiff's "defamation" claim for being called a "knucklehead", this is totally without merit.  Under Alabama law, a communication is considered defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts* § 559 (1976). Whether the communication is reasonably capable of a defamatory meaning is a question, in the first instance, for the court. *Albert Miller & Co. v. Corte,* 107 F.2d 432 (5th Cir.1939) (applying Alabama law), *certiorari denied,* 309 U.S. 688, 60 S.Ct. 890, 84 L.Ed. 1031 (1940); *Restatement, supra,* § 614, comment b.  Thus, if the communication is not reasonably capable of a defamatory meaning, there is no issue of fact, and summary judgment is proper.  A prisoner being called a "knucklehead" for placing himself in harm's way and not following proper prison procedure for the repair of a mechanical problem in hardly defamatory.  As the court is well aware, truth is an absolute defense to a claim for defamation.

## CONCLUSION

There are no genuine issues of material fact, and the Defendants are entitled to judgment as a matter of law.  The Defendants respectfully request that this Honorable Court dismiss the claims against them.

Respectfully submitted,

TROY KING, KIN047
ATTORNEY GENERAL


*/s/Benjamin H. Albritton*
Benjamin H. Albritton (ASB-0993-R67B)
ASSISTANT ATTORNEY GENERAL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 7th day of December, 2007, served a copy of the foregoing by first-class United States Mail, postage prepaid and addressed upon the following:

Zephyrinus Egbuonu
Reg. No. 27041-265
Federal Detention Center
PO Box 5010
Oakdale, LA 71463


<u>/s/Benjamin H. Albritton</u>
Benjamin H. Albritton
ASSISTANT ATTORNEY GENERAL


**ADDRESS OF COUNSEL:**

Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama 36130-0152
334-242-7300
334-242-2433 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephyrinus Egbuonu, 242109
PLAINTIFF

CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
            DEFENDANT

### A F F I D A V I T

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Howard Williams, Steward I, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

My name is Howard Williams, and I am presently employed as Steward I with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

I, Steward I Howard Williams, lst Shift, do not make shift or job assignments for inmates designated by the Institutional Job Board to work in the Food Services Division/kitchen. Inmate Egbuonu was approved by Chief Steward Michael Warren to be reassigned to 1st Shift after complaining that he did not have access to the Inmate Law Library while working on to 2nd Shift.

I specifically recall Inmate Egbuonu working on my shift in the kitchen because of his constant complaints about dishwashing detergents, gloves and shoes.

Every inmate that is assigned a particular job in the kitchen is orientated by Chief Steward Michael Warren, Steward II Willie Sanford (1st Shift) or Steward II Leon Varner (2nd). Chief Steward Warren trained Inmate Egbuonu himself on the proper kitchen sanitation and safety procedures in washing the pots and pans to include the temperatures of the water, gloves available to be used in the washing area, amounts of detergent and the appropriate way to use the soaps and cleaners. Chief Steward Warren, Steward II Sanford or I do checks on the amounts of detergent being used by the inmates working in the pots and pans area throughout each day.

1

**EXHIBIT**

**1**

In accordance with the Alabama Health Department Standards temperature wash water must be 100 degrees and sanitizing water must be 180 degrees. Therefore, elbow length Neoprene Gloves which are heavy duty and heat resistant are provided to the inmates assigned this task. The gloves are available in this area and the inmates are instructed to wear them when performing these tasks. The gloves are kept in the wash room for each inmate assigned these duties to use. The gloves in this area are used by all inmates assigned these duties on both shifts. There are only two shifts in the kitchen – 1st and 2nd.

Each inmate is required to wear state Brogans or if they have personal leather tennis shoes they have the option to wear them. The leather brogans or leather tennis protect their feet from hot water splashing or spilling on them. Brogans are issued by the Laundry Manager, Mr. Tommy Dawson. They are replaced by Mr. Dawson when they are torn or worn out. The inmate shows Mr. Dawson their worn out brogans and they are replaced with the appropriate size.

Specific instructions are given to each inmate on the proper amount of dish washing detergent to be used. Attached is a copy of the label of the detergent label which states "It is formulated to be especially mild and gentle to hands, but capable of doing a thorough cleaning job."

Inmate Egbuonu made numerous complaints about the detergent while working on 1st shift. In his complaint he stated that he "observed that his fingers began to wear off from the chemical he was using to wash the dishes and was concerned of his safety." Every time_ an inmate on my shift makes a complaint known about any injuries or medical problems related to his kitchen work I call for the Shift Commander to come take the inmate to the medical unit or send him to the medical unit myself. If it is a normal complaint about a headache or cold, etc. I tell the inmate to sign up for sick call. If the medical unit gives the inmate a stop up/pink slip for a particular number of days or restricts his work relating to an illness or injury the steward honors the medical slip. Inmate Egbuonu never presented a pink slip of any kind to me for any type medical restrictions or problems.

Inmate Egbuonu did complain once about a cut on his hand or finger and I instructed to report to the medical unit. He did not return with any stop up or pink slip.

Therefore, I gave him a pair of latex gloves to keep the cut area dry when he was not washing pots and pans.

On 6-1-06 inmate states in his complaint that he was "performing his work assignment at the kitchen, dish washing hot-water fell on the plaintiff's shoe, penetrated into his shoe to his foot and toe, the shoe given to him failed to block the penetration of the hot-water into his shoe. …immediately reported the incident to the KCF inmate's general population kitchen steward, Ms. Abro, who notified the lieutenant office for assistance." The inmate was taken to the hospital unit where a body chart and medical exam was performed on his foot. Inmate Egbuonu stated to Nurse Susie Smith according to her MHSMD-70007 dated 6-1-06 that "hot water was sitting on the floor in a bucket. It had a hole in the bucket and …H2O leaked out on to my boot down into my L shoe." The body chart is attached indicating "red and irritated near his small toe – no swelling."

At no time have I ever failed to provide proper safety and operating instructions to inmates assigned to the kitchen/Food Services Division on my shift. Newly assigned inmates are usually paired with an experienced inmate in that area to help guide and direct him until the inmate is fully trained. A steward is on duty on each shift to answer any questions, accept and handle any problems, etc. from each inmate working in the kitchen.

Inmate Egbuonu alleges in his complaint that on 5-18-06, he observed the ceiling fan in the wash area was unplugged and that he climbed up and plugged the fan in. Kilby's Maintenance Department is responsible for making all repairs to equipment inside the kitchen. Inmate Egbuonu should have reported the fan being unplugged to the steward on duty rather than climbing up to plug it in himself. I did call the inmate a "knucklehead" meaning that he should have known better than doing that. Nothing derogatory was meant by the word. The inmate became verbally defensive about the name and I called for Lt. Cash to report the incident.

I do not recall another inmate being allegedly injuried on 6-6-06 as Inmate Egbuonu alleges in his complaint.

I was counseled by Chief Steward Warren on how to conduct himself when dealing with inmates regarding me calling Inmate Egbuonu a "knucklehead". Inmate Egbuonu made it very clear that he did not want to work in the kitchen through his constant complaints to me.

3

I have not violated Inmate Egbuonu's constitutional rights in any manner.

Howard Williams, Steward I
Kilby Correctional Facility

State of Alabama
Montgomery County
Sworn to and subscribed before me and under my hand and official seal this the 11th day of October, 2007.

Betty S. Carr, Notary Public
My comm. expires 12-17-09.

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

Zephrinus Egbuonu, 242109
   PLAINTIFF

            CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
   DEFENDANT

## A F F I D A V I T

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Lt. Kenneth Cash, Correctional Lieutenant, 2nd Shift, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

My name is Kenneth Cash, and I am presently employed as 3rd Shift Correctional Lieutenant with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

As the 3rd Shift Commander I am constantly called to the Kitchen to assist the Steward with problem inmates. I can not recall Inmate Egbuonu or any incident involving this inmate. If I was called by Steward I Howard Williams for assistance in the kitchen with Inmate Egbuonu the problem must have been very minor. I did not write an incident report or a disciplinary on this inmate because it was apparently not that serious of an incident.

I can not remember calling any inmate a "knucklehead" as Inmate Egbuonu alleges in his complaint. I do tell inmates that fail to perform their work assignments satisfactory that if they fail to complete their assigned duties in a satisfactory manner as directed by their supervisor that they can be written a disciplinary for whatever reason and it would be placed in their institutional file with a copy going to the Parole Board.

Inmates are not permitted to enter the medical unit or pass through Gate #5

1



EXHIBIT
tabbies®
2

without authorization from the Lt.'s Office and must be escorted by an officer or an officer at Gate #5 to clear him through to the medical unit.  I have no recollection of Inmate Egbuonu or any problems the kitchen may have had with him.  I deny that I would ever coerce or threaten any inmate to perform his job duties in an unsafe environment.


Kenneth Cash, Correctional Lt.
Kilby Correctional Facility

State of Alabama
Montgomery, AL
    Sworn to and subscribed before me and under my hand and official seal this the _12_ day of October, 2008.


Betty S. Carr, Notary Public
My comm. expires 12-17-09.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ZEPHYRINUS EGBUONU,           )
#27041-265                    )
    Plaintiff,          )
                              )
v.                            )          2:07-CV-685-ID
                              )
KILBY CORRECTIONAL FACILITY   )
et al.,                       )
    Defendants.         )

## **A F F A D A V I T**

**State of Alabama**   :

**Elmore County**   :

    Before me, the undersigned authority, a Notary Public in and for said County and State of Alabama at large personally appeared Bobby Barrett, who being known to me and being by me duly sworn, deposes and says on oath as follows:

    My name is Bobby Barrett. I am presently employed as a Correctional Warden II, with the Alabama Department of Corrections at Staton Correctional Facility, P.O. Box 56, Elmore, Alabama 36025. I am over twenty-one years of age and have personal knowledge of the facts set forth below.

    On May 2, 2006, I received an inmate request slip from Zephyrinus Egbuonu, B/242109, requesting gloves to protect his hands. I referred him back to his supervisor, the kitchen steward. (see attached). I do recall speaking to Inmate Egbuonu in person emphasizing the same. The inmate stated he understood.

EXHIBIT

3

My recollection of inmate Egbuonu was one of constant complaining. The majority of his complaints were working in the kitchen. As Captain over the job placements, I saw no indications where he needed to be moved. This decision was made after speaking with the Chief Steward, Michael Warren and Steward II, Leon Varner.

Inmate Egbuonu also complained about the law library. This inmate had opportunities to use the law library as does all inmates.

In reference to conditions in the kitchen, as described by said inmate, extra ventilation was installed in his work area and painting was and is a top priority at Kilby. The extra ventilation was installed prior to Egbuonu's complaints. In regards to the safety issue, all safety issues are dealt with immediately.

The other allegations i.e. detergents and shift assignments are the decision of the stewards. The detergents used at Kilby are the same used throughout the state.

The allegation of proper footwear was addressed by the steward. Egbuonu's work boots were replaced by Kilby's Laundry with another pair of work boots.

I only received one (1) request from Egbuonu and it was answered. I only recall speaking to him one other time as described earlier. I recall one other time Steward Varner escorted Egbuonu to the Lieutenant's office for unsatisfactory work in which the on duty Lieutenant resolved the issue.

I deny any other allegations brought forward by Egbuonu. I have not violated any of Egbuonu's rights.

_Bobby Barrett_

Bobby Barrett, Warden II

SWORN TO and SUBSCRIBED before me this 9th day of October 2007.

_Lorraine Susan Collier_

NOTARY PUBLIC

2/8/2011

My Commission Expires:

# A F F I D A V I T

**ZEPHYRINUS EGBUONU**

**#27041-265**

**PLAINTIFF**

**VS**                                      CIVIL ACTION:  2:07-CV-685-ID

**KILBY CORRECTIONAL FACILTY**

**et al.,**

**DEFENDANTS**

## STATE OF ALABAMA

## MONTGOMERY COUNTY

I, Bobby Barret, hereby certify and affirm that I am Warden **II** at Staton Correctional Facility; that I am one of the custodians of the inmate institutional records at this institution; that the attached documents are true, exact, and correct photo-copies of certain original documents maintained here in the institutional files; and that I am over the age of nineteen (19) years and am competent to testify to the aforesaid documents and matters stated therein.

I further certify and affirm that said documents are maintained in the usual and ordinary course of business at the Kilby Correctional Facility; and that said documents (and the entries therein) were made at, or reasonably near the time that such acts, events, and transactions referred to therein are said to have occurred.

This, I do hereby certify and affirm to on the 9th day of October, 2007.

**Bobby Barrett, Warden II**
**Elmore Correctional Facility**

State of Alabama
Montgomery County
Sworn to and subscribed before me and under my hand and official seal this the
9th day of October, 2007.

Lorraine Susan Collier
My comm. expires 2-08-2011

## INMATE REQUEST SLIP

Name _Zephyrinus Egbuonu_ Quarters _KCB 212_ Date _5/2/06_

AIS # _242109_

( ) Telephone Call       ( ) Custody Change       ( ) Personal Problem
( ) Special Visit        ( ) Time Sheet           (X) Other _Washing Gloves_

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, I will be glad if your office
Can assist provide me with a washing
gloves to decrease hot water excruicat
tenure on my hand during washing
pot and pan in the kitchen.

Thank for your assistance.

Do Not Write Below This Line - **For Reply Only**

Talk to the steward.

Capt. Barnett

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (Check One)

( ) Warden              (X) Deputy Warden        ( ) Captain
( ) Classification Supervisor   ( ) Legal Officer - Notary   ( ) Record Office
                                    Public

N176

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephyrinus Egbuonu, 242109
     PLAINTIFF

                                CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
     DEFENDANT

## A F F I D A V I T

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Leon Varner, Steward II, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

My name is Leon Varner, and I am presently employed as Steward II with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

I, Leon Varner, am a Steward II with the Kilby Correctional Facility and I do act as Chief Steward in the absences of Chief Steward Michael Warren. I am the Steward II on 2nd shift that supervises inmates assigned to work in the kitchen on 2nd shift. I do order kitchen supplies, supervise other kitchen stewards and insure inmates are trained and are in compliance with Public Health requirements.

Inmate Egbuonu was assigned by the Institutional Job Board in October, 2005, to work in the Kilby Food Services Division. Inmate Egbuonu admitted in his complaint that immediately after being assigned to 2nd shift in the kitchen by Chief Steward Michael Warren that he began asking for a job assignment change. Inmate Egbuonu was approved by Chief Steward Warren to be reassigned to 1st Shift.

I do not recall having a conversation with Inmate Egbuonu where he requested to know the contents of the dish washing detergent. I was not his immediate supervisor on lst shift. Steward II Willie Sanford and Steward I Howard Williams were his immediate supervisors.

I, Steward II Varner, train all inmates on 2nd shift in the proper kitchen sanitation and safety procedures in washing the pots and pans to include the temperatures of the

1

EXHIBIT
4

water, gloves available to be used in the washing area, amounts of detergent and the appropriate way to use the soaps and cleaners.

At no time did I tell Inmate Egbuonu that the "kitchen had no funds to buy and provide inmate kitchen workers with safety gears..." Kilby Correctional Facility Food Services does not provide each <u>individual inmate</u> assigned to the pots and pans room an <u>individual/personal pair of gloves</u>. I never advised him to complain to the Warden. The gloves in this area are used by all inmates assigned these duties on both shifts. There is only a lst and 2nd shift in the Food Services Division.

At no time have I ever failed to provide proper safety and operating instructions to inmates assigned to the kitchen/Food Services Division on my shift. Newly assigned inmates are usually paired with an experienced inmate in that area to help guide and direct him until the inmate is fully trained. Inmates assigned to work in the Food Services Division are not exposed to unsafe occupational areas or chemicals.

I have not violated Inmate Egbuonu's constitutional rights in any manner.

Steward II Leon Varner
Kilby Correctional Facility

State of Alabama
Montgomery County

Sworn to and subscribed before me and under my hand and official seal this the 15 th day of October, 2007.

Betty S. Carr, Notary Public
My comm. expires 12-17-09.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephrinus Egbuonu, 242109
PLAINTIFF

CIVIL ACTION: 2:07 CV 685-ID

VS

Kilby Correctional Facility, et.al.
        DEFENDANT

# A F F I D A V I T

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Michael Warren, Steward III, who being known to me and being by me first duly sworn, deposes and says on oath as follows:

My name Michael Warren, and I am presently employed as Steward III (Chief Steward) with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

I am the Chief Steward in the Food Services Division at Kilby Correctional Facility. I am responsible for administrative operation of the kitchen. I supervise and train all kitchen stewards in the operation of the kitchen and kitchen sanitation. I have certification training by the State of Alabama Health Department. I assign inmates to specific job duties, instruct and train inmates in their assigned responsibilities and duties as necessary to insure Public Health requirements are met regarding the preparation of food. Each inmate has a job description. I provide the staff inmates a safe work environment. I inspect the kitchen on a hourly basis for maintenance problems and immediately request assistance from the Kilby Maintenance Division to make necessary repairs. In my absence the Steward II on lst and 2nd shift assume all of my duties in maintaining a safe and sanitary work environment for this division and they maintain a shift pass on log.

Inmate Egbuonu was assigned by the Institutional Job Board in October, 2005, to work in the Kilby Food Services Division. I, Chief Steward Michael Warren, assigned him to work on 2nd shift as a line server. Immediately after being assigned to 2nd shift duties Inmate Egbuonu began to complain about not having access to the Inmate Law Library due to his work schedule on 2nd shift and wanted to work on lst shift. I approved Inmate

1

EXHIBIT

5

tables'

Egbuonu to be reassigned to 1st Shift at his request.

I assigned Inmate Egbuonu to the duties of pots and pans dish washer on lst shift. That was the only vacant slot on lst shift at the time I re-assigned him. He was required to wash the pots and pans used in cooking meals in accordance with the Alabama Health Department standards regarding temperature requirements. Wash water must be l20 degrees, rinse water must be 140 degrees, and sanitizing water must be 170 degrees. In accordance with these requirements elbow length Neoprene Gloves which are heat resistant are provided to the inmates assigned this task. The gloves are available in this area and the inmates are instructed to wear them when performing this job. Four (4) or five (5) pair are ordered at a time from outside vendors. A pair normally lasts a year. Inmates are not provided a personal pair of gloves. Each shift will use these gloves until they need to be replaced. These special gloves are kept in the pot and pan area and are available for the inmates to use.

Inmate Egbuonu made numerous complaints about the detergent in that he "observed that his fingers began to wear off from chemicals he was using to wash the dishes and was concerned of his safety." I took Inmate Egbuonu over to the pot and pan area and I asked him why was he not wearing the safety gloves which were laying in a red milk crate sitting next to the pot sink. I also asked him how much soap was he suppose to place in his water and he did not respond. I explained to Inmate Egbuonu how much soap and bleach he was suppose to use, 50 – 100ppm and I explained to him why. Inmate Egbuonu failed to utilize the safety gloves provided and was add 50% more chemicals to his water than required. He was intentionally doing this. When I asked him why he stated, "Because I do not want to be in the kitchen". Every time an inmates makes a complaint known about his health, injuries or problems in the kitchen, I have instructed my stewards to contact the Shift Commander's Office for permission to send the inmate to the health care unit or the inmate is allowed to sign up for sick call to receive medical care. It is the inmate's responsibility to report to the health care unit for treatment not the stewards. If the medical unit gives the inmate a "stop up/pink slip for a certain number of days to be absent from work or restricts specific duties that he can not perform on his job, the Food Service Division honors the request by allowing him to be off or not perform all required duties until released by the medical staff to return to full duty. Inmate Egbuonu never presented a pink slip of any kind to me or my stewards from the medical staff.

2

All inmates are required to wear state brogans which Inmate Egbuonu refers to in his complaint as a safety shoe or may wear their personal leather/vinyl tennis shoes at their discretion in this area to prevent hot water from splashing or spilling on their feet. State brogans are issued by the Laundry Manager, Tommy Dawson. There are also several pairs of 12 inch heat resistant boots that I receive from the supervisor over the farm to be used in the kitchen where needed for extra safety. On the day I inspected Inmate Egbuonu area the 12 inch rubber boots were sitting next to the pot sink area. On December 20, 2005, Inmate Egbuonu states in his complaint that his brogan was torn and had caused a foot callous and after reporting this to me I sent the Plaintiff to the laundry to get more boots and told him to sign up for sick call. The brogan was changed out for another pair of the same shoe type by the facility Laundry Manager.

Inmate Egbuonu continued to make allegations that he had problems with his hands from the chemical detergent, hot water burns and cuts on his hand and finger which were caused by the pots and pans. Inmate Egbuonu refused to wear safety gear that was in his area to use to protect his hands and feet. Not one time did Inmate Egbuonu report to the medical unit for medical treatment for any such complaints. After checking with the medical Health Services Administrator who reviewed his medical record, not one time did he request to be seen at sick call for any problems related to his complaints regarding his hands. There was one body chart done on this inmate where he stated to Nurse S. Smith on June 1, 2006 that "Hot water was sitting on the floor in a bucket. It had a hole in the bucket and $H_2O$ leaked out on to my boot down into my L shoe." The nurse noted only an irritated red area near the small toe with no swelling. See attached body chart.

I did verbally counsel Steward I Howard Williams about calling Inmate Egbuonu a "knucklehead" when he saw the inmate had climbed up and plugged in a ceiling fan that had mechanical problems. Steward Williams informed me that he used the word "knucklehead" only to mean that the inmate should have known better than climb up and plug in a ceiling fan without checking with his office to see what the problem was. Steward Williams stated the inmate could have fallen and gotten hurt. The Kilby Maintenance Department is responsible for all repairs in the kitchen when a steward notifies them of a maintenance problem.

The kitchen area is inspected daily by me and the stewards on duty for any safety hazards or mechanical problems. All problems are promptly reported to the Maintenance

Department and repairs are made accordingly. The Maintenance Supervisor assigns at least two inmates to the kitchen that have or had professional skills working in the free world. Some maintenance inmates assigned to work in the kitchen have plus or minus 15 years experience. When the problem is reported to a steward a work maintenance order is completed and forward to Deputy Warden Willie Rowell and onto the Maintenance Supervisor, Mr. James Talley. Normally, all problems are repaired within an 8 hour period and inspected by me. At no time would I knowingly allow any inmate to work in an unsafe or unsanitary environment.

I have not violated Inmate Egbuonu's constitutional rights in any manner.

Michael Warren, **Chief Steward**
**Kilby Correctional Facility**

State of Alabama
Montgomery County
Sworn to and subscribed before me and under my hand and official seal this the _16_ day of October, 2007.

Notary Public
My comm. expires _12-17-09_.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephrinus Egbuonu, 242109
              PLAINTIFF

                                                    CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
              DEFENDANT

## A F F I D A V I T

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared W. G. Rowell, Warden II, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

My name is W. G. Rowell, and I am presently employed as Warden II with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

I, W. G. Rowell, am the Correctional Warden II at Kilby Correctional Facility. I am responsible for the administrative operations of the prison. The Kilby Food Services Division is operated and supervised by Chief Steward Michael Warren. In Mr. Warren's absence Steward II's Leon Varner and Willie Sanford assumes this position. The Chief Steward is responsible to insure all safety policies and procedures are implemented and adequate equipment is available for the inmate's use in performing their job duties. The Chief Steward is responsible for presenting requests to the Business Manager to purchase needed items, supplies, equipment, and materials to include elbow length neoprene gloves. Budgeted funds or Institutional Contingency Funds are available to provide for the safety and sanitary conditions in the kitchen regarding inmates health and safety.

The Chief Steward is responsible for training all Stewards in food preparation, compliance with Public Health Department safety requirements regarding dish washing temperatures and detergent usage. The Stewards Is & IIs are then required to train and monitor the inmate usage of detergent, water temperatures for washing, rinsing and sanitizing the pots and pans and utensils. The Chief Steward and Stewards I & II then monitor the proper usage of such to insure compliance. The Stewards are required to make hourly inspections of the entire kitchen activities and equipment on each shift.

1

EXHIBIT
6

The Laundry Manager, Tommy Dawson, is responsible for ordering all brogans for inmate workers to use in the kitchen unless they request to wear their personal leather/vinyl tennis shoes. Any inmate who has worn out or torn brogans can report to the laundry manager to show him their brogans and more will be issued if they are determined to be defective or worn out.

My Plant Maintenance Supervisor III assigns I to 2 inmates to work full time in the kitchen to insure all minor mechanical problems are corrected immediately. If parts need to be ordered for the repair a Maintenance Supervisor will order needed parts promptly and insure the repairs are properly done and as quickly as possible. A Maintenance Supervisor is contacted for assistance when anything more than minor repairs are needed. A Maintenance man will inspect all repairs made by the inmate maintenance workers in the kitchen. Also, the Maintenance employee inspects the kitchen throughout each day for deficiencies.

I did receive several complaints from Inmate Egbuonu regarding his timesheet being incorrect. I forwarded these complaints to my Classification Supervisor for an investigation and a response back to the inmate. I received a complaint from Inmate Egbuonu regarding not having proper gloves and irritation from the detergent and chemicals. I referred these complaints back to the Chief Steward III to handle. Chief Steward Warren checked out the complaint and informed me gloves and brogans were available for him to use, but Inmate Egbuonu continuously refused to follow his instructions on how to mix the detergent and chemicals. Mr. Warren informed me that he personally monitored the use of the detergent and Inmate Egbuonu would continue to ignore his instructions in an attempt to be removed from working on the pots and pan line and from working in the kitchen.

Inmate Egbuonu alleges that he was denied access to the law library while on 2nd shift in the kitchen. Kitchen shift hours are as follows: Ist Shift 2 AM to IO AM; 2nd shift is 10 AM to 6 PM. He was assigned as permanent party inmate to reside at Kilby and was assigned a full-time job. All inmates have ample access to the Kilby Inmate Law Library Monday through Friday from 8:00 AM to 4:00 PM and on Saturdays from 3:00 PM to 6:00 PM regardless of which shift they work in the kitchen. However, Chief Steward Warren re-assigned Inmate Egbuonu from 2nd shift to Ist shift to accommodate his request. Inmate Egbuonu visited the Law Library 172 days from October, 2005 to July 31, 2006, according to the law library sign in roster.

I, Warden W. G. Rowell, asked Mrs. Linda Lawrence, Prison Health Services' Health Services Administrator, to review the medical file on Inmate Egbuonu from the date he

arrived at Kilby Correctional Facility on 9-6-05 until his transfer to Staton Correctional Facility on 8/1/07, to see if he signed up for sick call or sent any complaints concerning any type problems with his hands.  She reported that she reviewed his medical file and found no requests for sick call  related to any type problems with his hands or fingers in this file.

Inmate kitchen workers are free from cruel and unusual punishment.  They must follow the training instructions, institutional rules and regulations and safety guidelines given to them by the Stewards in the kitchen.  If a safety hazard is detected it is immediately corrected.    Safety equipment and "gear" is provided to all inmates in accordance with their job assignments.

I have not violated Inmate Egbuonu's constitutional rights in any manner.

W. G. Rowell, Warden II
Kilby Correctional Facility

State of Alabama
Montgomery, AL
Sworn to and subscribed before me and under my hand and official seal this the 16th day of October, 2007.

Betty S. Carr, Notary Public
My comm. expires 12-17-09.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephrinus Egbuonu, 242109
      PLAINTIFF

                              CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
      DEFENDANT

### A F F I D A V I T

      Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared W. G. Rowell, Warden II, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

      My name is W. G. Rowell, and I am presently employed as Warden II with the Alabama Department of Corrections, Kilby Correctional Facility, Mt. Meigs, Alabama. I am over nineteen (19) years of age.

      I further certify and affirm that said documents are maintained in the usual and ordinary course of business at the Kilby Correctional Facility; and that said documents (and the entries therein) were made at, or reasonably near the time that such acts, events, and transactions referred to therein are said to have occurred.

      This, I do hereby certify and affirm to on the 16th day of October, 2007.

                                W. G. Rowell, Warden II
                                Kilby Correctional Facility

State of Alabama
Montgomery, AL
      Sworn to and subscribed before me and under my hand and official seal this the 16th day of October, 2007.

                                  Betty S. Carr, Notary Public
                                  My comm. expires 12-17-09.

# LAW LIBRARY SCHEDULE

**Monday through Friday**        **8:00 a.m. to 4:00 p.m.**

*except*

**First Tuesday of the Month**        **1:00 p.m. to 4:00 p.m.**
(Segregation Visitation)

**First & Third Thursdays**        **1:00 p.m. to 4:00 p.m.**
**of the Month** (Population Visitation)

**Saturdays**        **3:00 p.m. to 6:00 p.m.**
**(Permanent party only)**

**Closed on all State Holidays**

_____
**Lt. V. Napier**
**Law Library Supervisor**

PRISON HEALTH SERVICES INCORPORATED

## EMERGENCY

| ADMISSION DATE | TIME | ORIGINATING FACILITY | | | |
|---|---|---|---|---|---|
| 6/1/06 | 0410 AM/PM | ☐ SIR  ☐ PDL  ☐ ESCAPEE _____ | ☐ SICK CALL  ☑ EMERGENCY  ☐ OUTPATIENT | | |

ALLERGIES: Quinne

CONDITION ON ADMISSION: ☐ GOOD  ☑ FAIR  ☐ POOR  ☐ SHOCK  ☐ HEMORRHAGE  ☐ COMA

VITAL SIGNS: TEMP 98.7 ORAL/RECTAL   RESP. 14   PULSE 77   B/P 122/77   RECHECK IF SYSTOLIC <100> 50 ____/____

NATURE OF INJURY OR ILLNESS

Body Chart

S- Hot water was sitting on the floor in a bucket it had a hole in the bucket ant H2O leak out onto my boot down into my (L) shoe.

D- Alert & Oriented x 3 resp c ease, skin warm & dry to touch. (L) foot red & irritated on near small toe no swelling

PHYSICAL EXAMINATION

noted applied T.A. Ointment to toe

A- Altered Health Status R/T DX

P- Continue to monitor

| | ABRASION /// | CONTUSION # | BURN XX XX | FRACTURE Z Z | LACERATION / _____ SUTURES |
|---|---|---|---|---|---|

PROFILE RIGHT OR LEFT

RIGHT OR LEFT

| ORDERS / MEDICATIONS / IV FLUIDS | TIME | BY |
|---|---|---|
| Tripple Antibotic Ointment to (L) foot | 0415 | [initials] |

DIAGNOSIS

INSTRUCTIONS TO PATIENT: Return to W.W. if worsen

| DISCHARGE DATE | TIME | RELEASE / TRANSFERRED TO | CONDITION ON DISCHARGE | | |
|---|---|---|---|---|---|
| 6/1/06 | 04 AM/PM | ☑ DOC  ☐ AMBULANCE  ☐ | ☑ SATISFACTORY  ☐ POOR  ☐ FAIR  ☐ CRITICAL | | |

| NURSE'S SIGNATURE | DATE | PHYSICIAN'S SIGNATURE | DATE | CONSULTATION |
|---|---|---|---|---|
| S. [signature] | 6/1/06 | (P) 6/1/06 | | |

| INMATE NAME (LAST, FIRST, MIDDLE) | DOC# | DOB | R/S | FAC. |
|---|---|---|---|---|
| EGBUONU, Zephyrinus | 242/09 | 3/4/65 | B/m | Kilby |

PHS-MD-70007          (White - Record Copy  Yellow - Pharmacy Copy)

**Produced and Distributed by:**

### ALABAMA CORRECTIONAL INDUSTRIES



**a division of the**
### ALABAMA DEPARTMENT OF CORRECTIONS
**1400 Lloyd Street, Montgomery, AL 36107**
**334-261-3600 — [1-800-ACI-7007]**

ENTERED AUG 1 3 2007

# ALL PURPOSE
# MANUAL DETERGENT



| Caution | First Aid |
|---|---|
| — Keep out of reach of children. | — If taken internally, give 2 to 4 glasses of water immediately and call a physician. |
| — Do not splash in eyes. | — If splashed in eyes, flush with water for 15 minutes. If irritation persists, call a physician. |
| — Do not take internally. | — In case of external contact, flush with water. |

### Description
This biodegradable product is properly balanced for quick and thorough removal of grease and soil from dishes, glassware, pots, pans, and other hard surfaces. This detergent is compounded to assure maximum cleaning power, regardless of water conditions. It is formulated to be especially mild and gentle to hands, but capable of doing a thorough cleaning job.

### Directions
—For hand dish washing of dinnerware, glassware, and food utensils: use 1/4 to 1/2 oz. per gallon of warm water. This is the equivalent of 1 heaping teaspoon per gallon.
—For pots and pans, use 1/3 oz. per gallon of water.
—For general purpose, normal usage is 1/4 oz. per gallon.
—For food service equipment: APMD should be sprinkled on dampened surface and wiped with a damp cloth. Heavy soil deposits should be scrubbed with a brush.